(Decided June 18th, 1896).

---

## THE COLUMBIAN IRON WORKS AND DRY DOCK COMPANY *vs.* GEORGE B. DOUGLAS.

*Sales—Description of the Thing Sold—Remedies of Buyer when a Different Article is Delivered—Construction of Contract—Condition—Warranty—Inspection of the Goods by the Buyer—Contract Partly in Writing and Partly by Parol.*

When there is a contract for the sale of goods by description, there is an implied condition that the goods shall correspond with the description.

When the contract between the parties is for the sale of a specific designated article, and some other similar article is delivered by the seller, such substitution is a breach of the contract, and no question of warranty is involved.

Before a buyer can be compelled to accept anything in fulfillment of a contract of sale, it must be shown, not merely that it is equally as good as the thing sold, but that it is the same article bargained for, and none other.

If a buyer has unwittingly received that which he has not bought, he has a right to return it; or, keeping it, to recoup, when sued for the price, the damages caused by the breach of the contract; or, if he has paid the purchase price, he may sue for the difference between that price and the market price of the substituted article delivered to him.

Plaintiff agreed to buy from defendant a certain quantity of steel scrap, consisting only of clippings, etc., from the steel plates of cruisers built by the defendant for the United States Navy. After the steel scrap was delivered and paid for, it was found that of the total 159 tons shipped, 89 tons were cruiser steel and 70 tons were not, and plaintiff was obliged to sell the 70 tons for a much less sum than he paid for it. *Held*, that plaintiff was entitled to recover the difference between the price paid and the value of the article delivered.

When there is a sale of goods by description, and the sale is made subject to inspection by the buyer, the description is not subordinated to the inspection unless the parties both agree to substitute an inspection by the buyer for the description furnished by the seller.

If the contract is partly in writing and partly by parol, it is for the jury to find what the agreement really was, and whether, when the written part of the contract is for a sale of goods by description, it was orally agreed that inspection by the buyer should take the place of the description.

Appeal from the Court of Common Pleas. The plaintiff offered the following prayer, which was granted and conceded to be correct as to the measure of damages. "If the jury find for the plaintiff, the measure of damages in this case is the difference between what 357,700 lbs. of steel scrap from the Government cruisers would have been worth at Latrobe, Pa., free from impurities, and what they may find the material mentioned in the evidence as having been actually shipped from Baltimore was worth in Latrobe, Pa., in the condition in which it actually was on its arrival at Latrobe.

The defendant offered the following prayers :

1st. That there is no evidence legally sufficient to establish a warranty of the goods sold, and that their verdict must be for the defendant.    (Rejected).

2nd. That under the letters filed in this case, the obligation was imposed upon the plaintiff to superintend the loading of the steel scrap, and that the defendant was under no obligation to sort the pile sold to the plaintiff, and that there is no legally sufficient evidence to show that the defendant released the plaintiff from this obligation or itself assumed this duty.    (Rejected).

3rd. That there is no legally sufficient evidence in this case to show a special or implied warranty of the steel scrap as to phosphorous or other tests ; that if they find that the plaintiff made his purchase of the material in the pile of scrap in the yard of the defendant on the 6th of August, under the letters offered in evidence, with notice that the said pile contained other material than steel scrap from the cruisers, if they shall find such notice, then the plaintiff assumed the obligation and acquired the right to have such other material set apart and rejected, and if they further find that the remainder of the scrap was steel used in the construction of the cruisers 9 and 10, even though the same contained more than .06 phosphorous, their verdict must be for the defendant.    (Rejected).

4th. That if the jury find that the plaintiff inspected the pile of steel scrap in the defendant's yard, and that after said inspection he wrote the letter of August 6th, 1892, and received the letter of the defendant of August 8th, 1892, and that subsequently an agreement to move the scrap from the pile to alongside a lighter furnished by the plaintiff, if they so find, as specified in the letter of the defendant of August 18th, 1892, and the jury shall further find that the plaintiff sent some one to superintend the loading of said scrap, and the jury shall further find that the material or scrap deposited alongside of the said lighter was the same scrap which was in the pile when it was inspected by the plaintiff, and

that the employees of the Lighterage Company had been employed by the plaintiff to load said scrap upon the cars upon the lighter, if they shall so find, and that said employees loaded the scrap upon the cars, and that the said scrap was steel scrap from cruisers Nos. 9 and 10, then their verdict must be for the defendant, although the jury find that there were in the material so loaded by the employees of the Lighterage Company upon the cars, if they shall so find, other material consisting of light scrap, such as sheet or galvanized iron, and steel or pipe, or other materials, such as turnings and borings, provided they find that it was the same material that was in the pile when inspected by the plaintiff, and although the jury shall further find that the steel so sold had more than .06 phosphorous.   (Rejected).

5th. That if the jury find from all the evidence in the case, that the plaintiff purchased the steel scrap in question, with the understanding that the defendant would deliver the same upon its wharf, and that the defendant would accept no abatement of the price, or recognize any claim for such abatement by reason of the quality of said scrap, after the said scrap had left the yard of the defendant, and the jury further find that the plaintiff assented to this, and sent some one to inspect the steel scrap and superintend the loading of the same on the cars, and that the said steel scrap is loaded upon the cars, upon a lighter alongside of the wharf of the defendant by the agents of the plaintiff, and was accepted and paid for without protest or complaint, then, in that event, the verdict must be for the defendant.   (Rejected).

The trial Court (HARLAN, C. J.) refused all of the defendant's prayers, and instructed the jury as follows :

*Court's Instruction.*—The jury are instructed that the defendant did not warrant that the steel scrap sold to the plaintiff would analyze not more than .06 of one per cent. of phosphorous, and .04 of one per cent. of sulphur ; and if the jury find that the steel scrap in the pile which had been seen by the plaintiff's agent, Douglas, on the occasion of his first visit, and referred to in the letter of August 6th,

was punchings, clippings, or shearings from plates, angles, beams, etc., from the cruisers built by the defendant for the United States Government, and that the said pile, when seen by the said agent, contained visible impurities of the character of those to which he now objects, and if the jury further find from all the evidence in the case, that the plaintiff purchased the steel scrap in question, with the understanding that the defendant would deliver the same upon its wharf, and that the plaintiff would send a person familiar with such material to pass upon it, and the defendant would accept no abatement of the price, or recognize any claim for such abatement by reason of light weight, dirt, or the quality of said scrap, after the said scrap had left the yard of the defendant, and the jury further find that the plaintiff assented to this, and sent someone to inspect the steel scrap and superintend the loading of the same on the cars, and that the said steel scrap was loaded upon a lighter alongside of the wharf of the defendant by the agents of the plaintiff, and was accepted and paid for without protest or complaint, then, in that event, the verdict must be for the defendant.

The jury returned a verdict for the plaintiff for $430.48.

The cause was argued before McSherry, C. J., Bryan, Fowler, Page and Boyd, JJ.

*William H. Buckler* (with whom were *Steele, Semmes & Carey* on the brief), for the appellant.

The cause of action is an alleged breach of warranty on the sale of certain steel scrap (from United States cruisers Nos. 9 and 10), which was sold by the appellant to the appellee, resold by him to the Latrobe Steel Works, and rejected, in part, by those works, in consequence of which the appellee has suffered loss. The appellant claims that it is in no way responsible for this loss, inasmuch as all warranty was expressly excluded from the contract of sale, and the task of securing scrap of a satisfactory quality was expressly thrown upon the appellee.

All warranty of quality was expressly excluded from the contract. The original contract of sale is contained in the appellee's written proposal of August 6th, and the appellant's written acceptance of August 8th. There can be no doubt that the refusal of warranty, and the demand for inspection which accompanied this acceptance were assented to by the appellee. While it is true that an offer must be accepted on the terms proposed, yet if new terms are introduced in the acceptance, the party making the offer is bound, *if he assents* to the modification. *Brantly on Contracts*, page 19; *Bank* v. *Clark*, 61 Md. 408. The appellee did not even protest against the refusal of warranty. Though he did protest against the requirement of inspection, yet he finally agreed to it, and punctually sent his brother to Baltimore for this purpose on August 23d. He therefore clearly assented to the clause in the appellant's letter of August 8th, by which warranty was repudiated, and this repudiation of warranty thus became an integral part of the contract of sale. For a similar case of express waiver of warranty, see *Woolridge* v. *Royer*, 69 Md. 113.

There was no warranty implied from words of description. If it be claimed that the description of the scrap, in appellant's letter of August 8th, 1892, as consisting of "punchings, clippings or shearings from plates, angles, beams, etc., from cruisers," is an implied warranty of the quality of such scrap, the appellant contends that the rules of law are diametrically opposed to such a view. It is true that "any affirmation of the quality of the article, made at the time of the sale, intended as an assurance of the facts stated, and relied on and acted on by the purchaser, will constitute an express warranty." *Crenshaw* v. *Slye*, 52 Md. 146; *Potomac Co.* v. *Harlan Co.*, 66 Md. 47. But in the language used in the case at bar there is clearly no affirmation of quality.

It is equally well settled that affirmations which are merely by way of description, are not a warranty. Thus there was no warranty in describing certain iron as "mill

iron" (78 Ill. 65), or certain tobacco as "sweet scented tobacco" (10 Pa. St. 320), and so here there can be no warranty in describing certain steel scrap as being *cruiser* steel. See 28 *Am. & Eng. Enc. of Law*, 763. Furthermore, the warranty implied from affirmations of quality is never assumed to exist where the buyer has had an opportunity to inspect the goods. *Warren Glass Works* v. *Keystone Co.*, 65 Md. 552.

This case is much stronger than the case at bar, because here there is no epithet of commendation applied to the steel scrap, whereas in the above case the coal was specified in the contract to be "fine and the run of the mine." The evidence clearly shows that Mr. Douglas not only had the opportunity of inspecting, but actually did inspect, the steel scrap, on each of his visits to Baltimore, and that he was fully aware of the impurities which it contained, as it lay in the appellant's yard. The largeness of the price paid for the scrap, upon which Mr. Douglas dwells in his letter of August 9th, 1892, certainly contains no implication of warranty. In the case above cited (56 Md. 553) it is said "a sound price is not tantamount to a warranty of the quality of the thing sold   *   *   *   There is no implied warranty, in a general sale, that the quality shall be equal to the price."

The case of *Camden Oil Co.* v. *Schlens*, 59 Md. 31, is in some respects so similar to the case at bar that its differences are worth pointing out :   1. In that case the written contracts each contain a definition of the quality of the petroleum, its *color* and *burning test* being specified. In this case there is no definition of the quality of the scrap ; it is merely stated to be scrap "from cruisers."   2. In that case the oil was delivered in close packages, and "it was impossible for the plaintiffs to discover the inferiority of the article until it had reached its ultimate destination." In this case the scrap was open to the inspection of the plaintiff's agent during the whole time of delivery.   3. In that case an inferior article was substituted by fraud ; in this case no fraud is alleged or proved.

It therefore follows, that under the original contract in the case at bar : First, there was no express warranty, but,. on the contrary, an express exclusion of warranty ; second,, there was no implied warranty.

No subsequent warranty was given in writing, and there is no clear parol evidence of such warranty. Mr. John Douglas writes of a promise " from your Mr. Thomas this P. M." (letter of August 24th), and speaks of " my promise from the Columbian Iron Works," but this simply means that Mr. Bouldin *made no objection* to Douglas' departure ; that there was *no great objection made* to his going, and that he himself said he *didn't think it was necessary* that he should wait. This is Mr. John Douglas' own explanation, and if compared with the express declarations of Bouldin and Thomas, that they never agreed to be responsible for loading the scrap, it can hardly be claimed that there is any sufficient evidence of an agreement on the part of anybody to relieve Mr. Douglas of the task of inspection.

Furthermore, Mr. Malster, the president of the appellant, is not alleged to have promised anything. The agreement, if any, was made by Mr. Bouldin, the bookkeeper, or by Mr. Thomas, the foreman of the gang of laborers. Neither Bouldin nor Thomas was an officer of the appellant corporation, and neither of them, therefore, can have had the slightest implied authority to bind the corporation by contracts of which the president, so far as appears, had not even any notice.

If there was parol evidence of a warranty, it would be inadmissible, because contrary to the Statute of Frauds. There being no written warranty, it is clear that an oral agreement, tending to modify the terms of the original contract as contained in the letters, would be ineffectual and null. A contract for the sale of goods and chattels is within the Statute of Frauds, and cannot be established by anything short of written evidence, unless the goods are to be delivered in a different condition from that in which they were at the date of the contract. *Eichelberger* v. *McCauley,*

5 H. & J. 213; *Rentch* v. *Long*, 27 Md. 188; *Bagby* v. *Walker*, 78 Md. 246. This contract was therefore clearly within the statute, since the scrap was bought where it lay, and was to be delivered in that condition. The contract for loading was entirely distinct and did not change the condition of the scrap, but merely moved it. Now, if a contract is within the Statute of Frauds, parol evidence is inadmissible to add to or vary its terms, and the defendant is only liable when a memorandum of the bargains signed by himself is produced at the trial. *Drury* v. *Young*, 58 Md. 551; *Baltimore Society* v. *Smith*, 54 Md. 187.

The subsequent warranty, even if in writing, would have been void, because without consideration. It is absolutely settled that a warranty made after, or apart from the contract of sale, is invalid, unless it has some new consideration to support it. *Benjamin on Sales* (Kerr's notes), section 815; 28 *Am. & Eng. Enc. of Law*, page 744. Since the contract of sale was contained in the correspondence of August 6th and 8th, 1892, it is clear that an alleged agreement entered into by Mr. John Douglas in Baltimore, on August 23rd or 24th, by which the appellant is claimed to have guaranteed the good quality of the scrap, must be void, as there is no evidence that any consideration whatever was given for such agreement.

The appellant submits that the Court's instruction was erroneous in leaving to the jury to " find from *all the evidence* in the case " whether or not the plaintiff had purchased the scrap without warranty. The alleged parol agreement being inadmissible, even if true, it became the duty of the Court to interpret the written contract, which alone bore upon the question of warranty, and this contract properly interpreted would have relieved the defendant from all responsibility, and would have directly led to the granting of the defendant's first prayer.

*Frederick W. Brune* and *George Stewart Brown*, for the appellee.

This is a suit brought by appellee against appellant, a corporation, to recover damages for breach of contract, which breach consisted in the failure of appellant to deliver certain clean steel scrap bought from it by plaintiff, consisting only of clippings or shearings and punchings from the steel plates, angles, beams, &c., of certain United States cruisers built by it, and in delivering, instead at the cars for direct shipment to a distant point, a miscellaneous lot of metal containing steel scrap so intermixed with iron, copper, galvanized iron, dirt and other impurities, that the steel scrap was rendered unmerchantable without great expense and labor, so that plaintiff lost the sale of the steel scrap to a customer to whom he had contracted to sell the same, and was compelled to dispose of it at a heavy loss.

The fact from appellee's point of view come to this result: That the appellant, through its agents, knowing what appellee had bought, and knowing that he was absent, took advantage of that absence to fraudulently ship stuff that they knew had no business in the cars, and appellant received payment for the stuff so shipped. And that the weight for which it was paid, as shown by the receipt, included payment for 159 tons of metal, of which the Latrobe Steel Works took 89 tons, and rejected over 70. Of this rejected stuff, 52 tons were sold as inferior steel, and 20 tons or thereabouts was sold as miscellaneous scrap, entailing a loss, according to appellee's proof, of $827.05 upon appellee, of which the jury allowed him by their verdict, $430.48, which was the actual cash loss of appellee, exclusive of profit that would have been received for the stuff if it had come up to contract requirements.

The record shows that Thomas and Bouldin were held out by appellant as authorized agents to represent it fully in all transactions relating to the delivery and inspection of the material bought by appellee, and the testimony of Douglas is explicit and the jury believed it, that appellant had undertaken, through its agents and representatives, to see to it that the objectionable material was kept out of the cruiser steel scrap sold to appellee.

1. The contract in this case was partly in parol and partly contained in the letters set out in the record. The question as to what was the contract was therefore to be determined by the jury. *Eureka Fertilizer Co.* v. *Balto. Copper Sm., &c., Co.,* 78 Md. 179, 187–8, 190. *Roberts* v. *Bonaparte,* 73 Md. 191, 197–8.

Defendant's first prayer could not be granted under any aspect of this case, as it ignores the description of the article bought and sold, viz.: " Scrap, &c., from cruiser steel," leaves out of consideration the parol evidence entirely, and misconstrues the written. The second and third and fourth prayers of defendant also ignored the parol evidence in the case and misconstrued the written, and they were, therefore, properly rejected. Under the Court's instruction appellant got the benefit of all the hypothesis upon which he could properly ask instructions, and it is almost in the language and embodies the substance of the fourth and fifth prayers of appellant.

2. The Court below, while rejecting appellee's contention that there was a warranty by appellant that the steel scrap should not contain more than .06 phosphorus and .04 sulphur, did hold, and properly, that appellee was entitled to get, and appellee was bound to deliver (with the limitations set out in the instructions), steel scrap from the United States cruisers. Appellant cannot complain of this part of the ruling. When the vendor sells an article by a particular description it is a condition precedent to his right of action that the thing which he delivers, or offers to deliver should answer the description. *Benjamin on Sales,* secs. 600 to 605 (6th American edition, Bennett's). It was held by SHAW, C. J., in *Winsor* v. *Lombard,* 18 Pick. 60, " that without express warranty, or actual fraud, every person who sells goods of a certain denomination or description undertakes, as part of his contract, that the thing delivered corresponds to the description, and is in fact an article of the species, kind and quality thus expressed in the contract of sale." See *Osgood* v. *Lewis,* 2 H. & G. 495 ; *Brown,*

*Graves, &c.* v. *Ambler,* 66 Md. 391, at 396–397 ; *Rasin & Co.* v. *Conley,* 58 Md. 59, at 63.

3. The existence of the impurities mentioned in the record was known to appellant's officers and agents, and they undertook and promised to keep them out of the scrap delivered on the wharf of appellant, to be there loaded on cars on the scows of the Baltimore Storage and Lighterage Company. It is admitted, as already shown, that as long as John B. B. Douglas was present these impurities were kept out, and that they were only put into the carts in his absence by the employees and agents of defendant under the nose and in the presence of Thomas, defendant's stock clerk. It is idle to believe that this could have been done without his active participation and knowledge. The carts and laborers loading and hauling the scrap to the wharf were defendant's servants, and plaintiff paid them 25 cents per ton of metal for their services. Defendant was paid, and accepted payment for all the contents of the scrap pile—*impurities and all.* The action of appellant's agents and employees in delivering the objectionable materials in appellee's absence was, therefore, a fraud upon appellee, and whether he had agreed to inspect the material or not, the appellant is responsible for all damage caused by this action. *Camden Consolidated Oil Co.* v. *Schlens,* 59 Md. 31, at 42, 43. This case is controlling of the present case.

4. If the appellee was bound to inspect the material before it left appellant's yard, and that no claim should be entertained or allowed after the scrap left, appellants could have waived this condition, and the acts of appellants' agents amounted to a waiver of the condition, if any such existed. This waiver could be by parol. *Allen* v. *Sowerby,* 37 Md. 410, at 420 ; *Kribs* v. *Jones,* 44 Md. 396, at 407 and 408 ; *Maryland Fire Ins. Co.* v. *Gusdorf,* 43 Md. 506 ; *McGrath* v. *Gegner,* 77 Md. 331, 333, 337–8 ; *Bagby & Co.* v. *Walker,* 78 Md. 239, 244–5 ; 2 *Taylor on Evidence,* sec. 1044.

The Statute of Frauds has no application to this case,

the contract *was fulfilled and executed. Webster* v. *Le Compte, Exr.*, 74 Md. 249, 257–9; *Crane* v. *Gough,* 4 Md. 333; *Brown on Statute of Frauds,* 5th ed. (1895), sec. 116; *Nicholson* v. *Schmucker,* 81 Md. 459.

Even if the contract were within the statute the appellee could prove that the written condition (if any such existed) was dispensed with by an oral agreement for a substituted performance. *Brown on Statute of Frauds,* secs. 424–5–6 and 428.

Thomas and Bouldin had authority to waive the inspection and acceptance of the scrap before it left appellant's yard (if any such stipulation had ever been agreed to by appellee), and they did waive it. Plaintiff's agent, John B. B. Douglas, had been turned over to them by Malster himself from his first visit, on August 3d, until he left, on August 24th. They had, as the proof shows, actual authority to represent appellant, they certainly had apparent authority; and their acts, promises, frauds and omissions bound appellant, and it got the benefit of their acts. *S. C. M. Association* v. *Meredith,* 49 Md. 389, at 400; *Lamm* v. *Port Deposit Homestead Asso.,* 49 Md. 233, at 241; *W. M. R. R.* v. *Franklin Bk. of Balto.,* 60 Md. 36, at 43–44; *Henderson Bridge Co.* v. *McGrath,* 134 U. S. 260, at 274; *Salt Lake City* v. *Hollister,* 118 U. S. 256, at 260–1, 2, 3; *Denver, &c., R. R.* v. *Harris,* 122 U. S. 597, at 607–8.

McSHERRY, C. J., delivered the opinion of the Court.

This suit was brought to recover damages for an alleged breach of contract. The declaration contains two counts; one upon the contract and one for money received by the defendant for the use of the plaintiff. The first count alleges in substance, that the plaintiff purchased from the defendant " all the steel scrap in the ship yard of the defendant  *  * consisting of clippings and punchings from the steel plates and angles and beams used in the construction of the United States cruisers built by said defendant;" and that the de-

fendant was to load the said scrap at the plaintiff's expense upon railroad cars on scows at its works.  That the defendant agreed to furnish clean steel scrap consisting only of clippings and punchings from the steel plates, angles and beams of the United States cruisers built by it, but that, though warned by the plaintiff not to deliver or to mix with said steel, any iron, copper or other scrap, yet the defendant, without the plaintiff's knowledge, in violation of its agreement, did deliver such iron, copper and scrap mixed with the steel scrap, whereby the steel scrap was rendered unmerchantable.  That relying on the contract and on the good faith of the defendant to deliver the material purchased, the plaintiff upon presentation of an invoice from the defendant for three hundred and fifty-seven thousand and seven hundred pounds of steel scrap, paid the defendant the sum of two thousand six hundred and seventy-four dollars and seventy-five cents ; and that the plaintiff immediately upon discovering, after the delivery of the material, that the defendant had wrongfully mixed iron, copper and other scrap with the cruiser steel scrap purchased, demanded a return of the money paid, and asked that directions be given with reference to the disposition to be made of the scrap, but that the defendant refused to return the money or to assume any responsibility as to the goods, whereby the plaintiff sustained great loss.  The defendant pleaded the general issue.  The verdict and judgment were for the plaintiff and the defendant has appealed.  There is but one exception in the record and that brings up for review the rulings of the Court of Common Pleas upon the prayers for instructions to the jury.

The contract sued on is, according the contention of the appellant, wholly in writing, whilst according to the contention of the appellee it is partly in writing and partly in parol. Whether it be the one or the other is of practically little consequence.  If wholly in writing, it is evidenced by numerous letters and telegrams ; and if partly in writing and partly in parol, it is evidenced by the same letters and telegrams, and by interviews between the agent of the plaintiff

and some of the officers and employees of the defendant. The negotiations opened July the nineteenth, eighteen hundred and ninety-two, with a written inquiry from the plaintiff to the defendant, as to whether the latter had on hand and for sale any steel scrap, angle or plate croppings or punchings. To this the defendant, which is a ship building company, replied the following day that it had a large quantity of steel scrap left from the Government cruisers that it had constructed; and that this scrap was first-class material. Considerable correspondence then followed until August the third. This correspondence related to the price, quality and quantity of the material, and included an offer at a named sum which was rejected; but subsequently a price was agreed on. Throughout the correspondence and the interviews the material negotiated for was described and understood by both parties to be scrap from cruiser steel. Two of the United States cruisers, the Detroit and the Montgomery, had been built for the Federal Government by the defendant at its yard in Baltimore. The steel of which the hulls of these vessels were made was required to be of a high grade and quality. The shearings, clippings and punchings from the plates, beams and angles used in the construction of the cruisers were the steel scrap which the plaintiff agreed to purchase and the defendant agreed to sell. Not only was no other material contemplated, but all other and different material was, in express terms, excluded. On August the second the plaintiff wrote as follows:

"I now confirm having made the purchase from you of from 125 to 175 tons steel scrap, consisting of clippings and punchings from the steel plates and angles used in the construction of the United States cruisers built by you, at $16.50 per gross ton f. o. b. cars your works, and will wait your confirmation of the sale. Terms of payment as usual in such cases, net cash, 30 days. We will send you instructions in regard to shipment within a few days, and would be glad to know when it will suit your convenience to load up the scrap."

And the next day the defendant replied :

" Yours of 2nd to hand, and contents noted.  In reply we respectfully call your attention to ours of 2nd, wherein we say the price of the material for which you are in negotiation with us is $16.50 per ton net.  Of course this does not mean that we shall load it on the cars, which we do not propose to do, neither will we accept other than prompt cash payments, as the cars leave here loaded, or short time paper, with interest added at the rate of six per cent. per annum, endorsed to our satisfaction.  These are the terms. We thought you understood this portion of the inquiries, as they have always been named.  These two points accepted by you and the material is yours."

Upon the receipt of this letter, instead of replying in writing, the plaintiff, who is an iron merchant, doing business in New York, sent his brother, John B. B. Douglas, to Baltimore to settle the matter and to conclude the negotiations. When Mr. Douglas reached Baltimore he called on Mr. Malster, the president of the defendant company, and they discussed the proposed terms of purchase and the cost of moving the material from the company's yard to the wharf for loading.  Mr. Malster had described the steel scrap as " a nice, clean lot."  Upon examining the pile Mr. Douglas noticed that there was a considerable amount of iron pipe and galvanized iron and pieces of wrought iron lying on the pile, and to this he took exception.  Mr. Malster's office assistant stated in reply that there was but a small quantity of this iron in the pile and that it was so entirely different in appearance from the steel that it could easily be kept out when loading.  Upon the return of Mr. John Douglas to New York, the plaintiff, on August the sixth, wrote in part as follows: " Confirming conversation with your Mr. Malster, yesterday, relative to your favor of third instant, I will take the lot of punchings and clippings from plates and angles of cruiser steel, at $16.50, per gross ton where they lie, terms cash on presentation of bill with railroad shipping receipt attached.  We will pay you 15c. per ton for loading

on cars, and if we ship by lighter or railroad float will pay 10c. per ton more (25c. per ton in all), to cover cost of cartage in your yard, and loading on lighter or in cars on float  *  *  *  In loading the scrap, please keep out all the light scrap, such as sheet or galvanized iron, and steel or pipe, and the other materials, such as turnings and borings.  I wish the stock loaded free from all such materials and dirt and earth, as my customer is particular in regard to this."  To this letter the defendant, on August the eighth, replied as follows : " In reply to yours of sixth instant referring to purchase of material will say : We accept your proposition to sell to you what punchings, clippings or shearings from plates, angles, beams, etc., we have from cruisers, for $16.50 per gross ton, as they now lie in our yard, and you to pay 15c. per ton additional to the above-mentioned figure, for loading cars in our yard, when they are loaded upon our track.  Thus far your proposal is accepted."  Then followed some observations as to the cost of loading and the letter concluded in these words : " Furthermore, we desire you to send some one familiar with the quality of such material, as referred to in our several letters, so as to pass upon it as to quality, for we wish you to take notice, and be guided accordingly, that there shall not be any rebate on the said material, on account of light weight, dirt or quality of material, or for any other cause after having left our yard."  On the ninth Douglas replied.  Part of his letter reads as follows :

" Regarding my sending some one to inspect the loading of the scrap, it is not very convenient for me to do so at present, and *I do not think it is necessary* unless you choose to take up so arbitrary a position as to compel me to do so.  I would be satisfied to accept the material as represented by you, that it is the ' punchings, clippings and shearings from plates, angles, beams, etc., from cruisers,' with your assurance that you would exercise every care that no other material is shipped.  Light sheet iron, borings, turnings, etc., do not come under your description, nor

would such real estate as might be shovelled into the cars with the steel.   We are paying you a high enough price to warrant your taking some little extra care in this respect, and will be satisfied with your assurance in regard to it.   It would be impossible for any one to accept a lot of scrap as being of the quality represented.   We know what the requirements of cruiser steel are, and presume what has been delivered to you has passed the Government inspection.   The only point we could decide would be whether what you loaded on the car was covered by the terms ' punchings, clippings and shearings from plates, angles, beams, etc.,' and in my opinion it should be unnecessary for us to send any one to decide such a matter."

Getting no reply he again wrote on the sixteenth, and amongst other things stated :

" In regard to sending some one to inspect the loading of the scrap, as already explained, it is hardly convenient to do so, and I would prefer to leave it to yourselves to load only a nice lot, which would come entirely within the description, and so be a means of leading to further business. However, if you could arrange a day for loading, say Tuesday or Wednesday of next week, when we could have a float in, I would try to have some one on hand to inspect the scrap.   If these, or any other day would suit you, please advise and I will endeavor to arrange it."

Again on August the 17th, Mr. Douglas wrote as follows :

"Confirming my respects of yesterday, we can arrange to take delivery of the scrap alongside lighter your wharf, and will pay you ten cents per gross ton for trucking in addition to fifteen cents for loading, making price in all twenty-five cents per ton for delivering scrap from where it lies to alongside float or lighter.   If this is satisfactory to you, on receipt of your confirmation I will order float to be sent in on any day suitable for you, say Monday, Tuesday or Wednesday of next week, and will have some one *on hand to inspect loading*, so as to start first thing in the morning, and have it go right along without further delay."

And on the following day the defendant replied to the letter of the sixteenth :

"In reply to yours of August 16th to hand, wherein you state, if we will load the material (*steel scrap*) and cart it to the side of a lighter, which you will have placed at our wharf, you will pay to us 25c. per gross ton for so doing ; as we understand it, we have nothing whatever to do with loading the scow or flat.   We load the carts with the scrap and haul it to the scow or flat, where we unload it alongside, or as near as we can get to the flat.   For this you will pay us 25c. per gross ton.   This we accept, although at a loss to us beyond what we previously agreed to.   But it must be understood that the above figure does not include the loading the flat, or doing anything other than above stated, and the flat to be placed as we may direct.   If the above is your offer, you can commence to move the stock at any time, with the understanding, however, that the part of our letter dated August 8th, *referring to payments for the said stock is in full force*, and the acceptance of this part of your proposal shall in nowise vitiate or annul that part of the contract."

On August the twenty-third John B. B. Douglas arrived at the defendant's ship yard at about eight A. M.   The witness was turned over to Mr. Malster's assistant, and the assistant turned him over to the yard foreman.   The work of carting the scrap to the wharf then began.   The witness noticed the galvanized iron and other objectionable material on the pile hauled to the wharf, pointed it out and it was removed and placed in a separate heap.   On the following day the hauling to the wharf and the loading aboard the cars on the scow continued, explicit instructions having been given by John Douglas that the objectionable scrap should not be loaded.   Being called away, Mr. Douglas notified the yard foreman that he would leave for Philadelphia, and there being no objection to his going he went, relying upon the good faith of the defendant not to load the material that had been rejected and depending on the understanding that

only cruiser steel would be put on the cars. The loading from the wharf to the cars was done by the Baltimore Storage and Lighterage Company. The barge with the loaded cars left the defendant's wharf on August the thirty-first. The defendant wrote, enclosing invoice and receipt of the Lighterage Company for 357,700 pounds of "steel scrap," and the next day the plaintiff forwarded his check for the amount claimed to be due. On the second of September the defendant returned a receipted bill for the same number of pounds of "steel scrap." The plaintiff sold the scrap to the Latrobe Steel Works of Pennsylvania. When it reached Latrobe in the cars loaded at the defendant's yard it was found that of the total one hundred and fifty-nine tons shipped eighty-nine tons were cruiser steel and seventy tons were not. By reason of this default the plaintiff was obliged to sell the seventy tons at a much less sum than he had paid for it, in consequence of which he incurred considerable loss. On October the thirteenth the plaintiff communicated this result to the defendant and the defendant in reply merely referred to the antecedent correspondence. To recover for the loss thus sustained the pending suit was subsequently brought.

Under all these circumstances there ought to be, and we think there is, no serious difficulty as to the law which should govern this case. Without going into a specific criticism of each prayer and each instruction contained in the single exception which the record brings up, a general statement or summary of the law upon the subject involved will be sufficient, we apprehend, to show that there is no error suggested of which the appellant has the slightest reason to complain. It is a mistake to assume that the doctrines applicable to warranties have any reference to or can be invoked in this controversy. The contract, whether treated as evidenced alone by the writings referred to, or as consisting of both the writings and the parol interviews, is obviously not an agreement warranting the steel scrap to be of a designated or prescribed quality; but in whichever

light the contract may be viewed it is impossible to escape the conclusion that it was an agreement for the purchase by the appellee and for the sale by the appellant of a specific, designated thing ; and that thing was, not steel of a described grade free from a named percentage of sulphur and phosphorus, *but steel scrap from the plates, beams and angles of United States cruisers* built by the appellant. This was the named and designated—the specific and identical—thing contracted for ; and the substitution of any other or different material, no matter what its quality or chemical test might be, was a clear breach of the undertaking entered into by the parties.   When a person buys a particular thing he cannot be compelled to take some other thing, even if like the thing he bought.   He has a right to insist on the terms of his contract.   If he has unwittingly received that which he has not bought he has the right to return it, or, keeping it, to recoup when sued for the stipulated price, the damages which a failure to comply with the contract has caused him; or, finally, if he has paid the purchase price he has the legal right to sue for and to recover back the difference in value between the price which he paid for an article he did not get, and the market price of the substituted article delivered to and retained by him.   He cannot, if he has purchased a cargo of peas be required to take a cargo of beans. LORD ABINGER in *Chanter* v. *Hopkins*, 4 M. & W. 399 ; 2 *Benj. on Sales*, 768.   Before a defendant can be compelled to take anything in fulfillment of a contract of sale it must be shown not merely that it is equally as good as the article that was sold, but that it is the *same* article he has bargained for and none other.   LORD BLACKBURN, in *Bowes* v. *Shand*, 2 App. Cas. 455 ; 2 *Benj. on Sales*, 768.   In other words, if the sale is of a described article, the tender of an article answering the description is a condition precedent to the purchaser's liability, and if this condition be not performed the purchaser is entitled to reject the article, or, if he has paid the purchase price, he is entitled to recover back the price as money had and received for his use.   2 *Benj. on*

*Sales*, sec. 918. This doctrine cannot be better stated than it was put by LORD ABINGER in *Chanter* v. *Hopkins, supra.* " A good deal of confusion has arisen in many of the cases upon this subject, from the unfortunate use made of the word warranty. Two things have been confounded together. A warranty is an express or an implied statement of something which a party undertakes shall be part of a contract, and though part of the contract, *collateral to the express object of it.* But in many of the cases, the circumstance of a party selling a particular thing by its proper description has been called a warranty, and the breach of such a contract a breach of warranty ; but it would be better to distinguish such cases as a non-compliance with a contract which a party has engaged to fulfill ; as if a man offers to buy peas of another and he sends him beans, he does not perform his contract ; but that is not a warranty ; there is no *warranty* that he should sell him peas, the *contract* is to sell peas and if he sell him anything else in their stead, it is a non-performance of it." Precisely this principle is recognized in *The Warren Glass Works Co.* v. *The Keystone Coal Co.*, 65 Md. 547. It can make no possible difference whether the failure of the plaintiff to receive what he contracted to get, grew out of the fraud of the defendant or out of an accident unmixed with bad faith.

If the contention of the appellant that the contract was wholly in writing be conceded, then there was obviously a sale of goods by description, and as the question of warranty was not involved at all, it would have been palpable error to have denied the plaintiff a recovery on the ground that there was not a warranty, though the condition precedent that the goods sold should be what they were alleged to be was wholly unfulfilled. There can, therefore, be no error predicated of the refusal on the part of the Court below to grant the appellant's first prayer.

If the theory of the appellant be accepted that there was no condition precedent as to the character of the goods involved in their description, and that the sale was made sub-

ject to inspection; then, assuming the contract to have been evidenced solely by writing, there was no term in it which subordinated the description to the inspection; because it is perfectly apparent the minds of the two contracting parties never concurred in substituting an inspection by the purchaser for the description furnished by the vendor.   This is made clear by the correspondence heretofore transcribed. But if on the other hand the contract was both in writing and in parol, then the question as to inspection was a question as to the construction of the contract and was for the jury, and the Court so considering it left it to them.

These views dispose of the whole case.   If the contract be treated as one wholly in writing the appellant wrongly construes it.   If it be considered as partly in writing and partly in parol, the appellant's prayers were wrong in assuming that it was wholly in writing.   The instruction given by the lower Court cannot be objected to because it was in fact more favorable to the appellant than the appellant was, in strictness, entitled to receive.

As we find no errors we shall affirm the judgment.

*Judgment affirmed with costs above*
*and below.*

(Decided June 18, 1896).