PIONEER ENGINEERING WORKS, INC., Respondent, *v.*
McCONNELL, Appellant.
No. 8791
Submitted May 16, 1949. Decided October 8, 1949.
Rehearing Denied January 5, 1950.
212 Pac. (2d) 641

Mr. George E. Hurd and Mr. Emmett C. Angland, both of Great Falls, for appellant. Mr. Angland argued orally.

Messrs. Rankin and Acher, Helena, Mr. James T. Shea, Mr. C. H. Roberts, and Mr. John Marriott Kline, all of Glasgow, for respondent. Messrs. Rankin and Acher argued orally.

Mr. Ralph J. Anderson, Helena, amicus curiae. Mr. Anderson argued orally.

MR. JUSTICE METCALF:

The plaintiff, Pioneer Engineering Works, a Delaware corporation, sold to the defendant, P. H. McConnell, a plant to crush, wash and grade gravel and sand in order to supply sand and gravel for a power plant building to be erected by the United States near the Fort Peck Dam. The machine was sold to the defendant on a conditional sales contract, the plaintiff retaining title and the right to terminate the contract and repossess the property upon the failure to make payment of the installments of the purchase price. After the first payment the defendant refused to make any further payments on the ground that the machine did not do the work that it was warranted to do. Plaintiff thereupon brought a suit to terminate the contract and repossess the plant and machinery.

The defendant filed an "answer and counterclaim." The trial court held that the defendant's counterclaim for damages did not "tend to diminish or defeat the plaintiff's recovery" in a claim and delivery action and refused to hear any evidence on the counterclaim. Judgment was rendered for the plaintiff.

That judgment was before this court in 1942. The opinions handed down at that time are reported in 113 Mont. 392, 130 Pac. (2d) 685, 687 and 132 Pac. (2d) 160. In those opinions this court held that a defendant in an action for claim and delivery could interpose a cross complaint for breach of warranty and that this defendant's so-called counterclaim would be regarded as such a cross-complaint. The court further held that "We do not presume to say that the plaintiff here is a wrongdoer, but only say that the allegations set up in the cross-complaint charge plaintiff with wrongdoing, resulting in damages to the defendant. This is a subject matter which we now hold may be litigated under the cross-complaint notwithstanding former decisions to the contrary which have been expressly overruled." Thereafter a motion for the recall of remittitur was filed, the contention being that even though a cross-complaint could be interposed in a claim and delivery action, the cross-complaint

in the instant case did not state facts sufficient to constitute a cause of action in favor of the defendant and against the plaintiff. This motion was denied.

Thereafter the cause was tried in the district court of the 17th judicial district. The trial commenced February 3, 1947, and progressed until March 5, 1947, on which date the trial judge was advised that Mr. Hurd, one of the counsel for the defendant, had become ill. The trial judge then took a recess until March 13th. When the court convened on that day Mr. Hurd was still unable to participate in the trial. From March 13th to March 24th Mr. Emmett C. Angland, the other counsel of record for the defendant, continued with the trial of the case. On March 24, 1947, Mr. Angland also became ill. His illness was diagnosed by his attending physician as moderately severe nervous exhaustion. Mr. Angland was under orders from his physician to refrain from participating in any further work until he was recovered. On March 24th neither Mr. Angland nor Mr. Hurd were physically able to proceed with the trial. The defendant made an attempt to secure other counsel and was unable to do so. The illness of Mr. Hurd and Mr. Angland was brought to the court's attention by defendant's son, Mr. William P. McConnell. Thereupon the trial was recessed until 1:30 p. m. on March 25th and again until 9:30 a. m., on March 28th. There was considerable consultation between the defendant's son and the trial judge regarding further continuance of the case until such time as defendant's counsel were able to return or other counsel could be obtained. On March 28th the trial judge indicated by his oral remarks that are a part of the record, that any further attempt for a continuance would be useless. On that day the court said: ''The record may also show again that Mr. McConnell has intimated that he is considering an application for further postponement or postponement and continuance. I am endeavoring to approach the answer to these problems to give consideration to the adequate protection of the defendant's position by way of a motion for a new trial if the court finally concludes that nothing further can be done by taking testimony now. I believe

that a motion for a new trial can be so prepared that abuse of discretion, if it should be such, which the court might have committed or might commit, could be reviewed on a motion for a new trial, and it is my considering all that has been called to my attention that it is not reasonably possible to assume that an adequate application for continuance or postponement can be made, and I think at this time that the record discloses that the defendant is desirous of asking and has asked orally that it might be continued, that the trial be continued, but in the light of the background, that is the motion which was made by Mr. Angland and denied [one of several motions previously interposed by Mr. Angland], I feel that that can be disposed of in a motion for a new trial, and I think it is proper at this time to decline to entertain a motion for postponement and I indicate that I in the light of the defendant's position that I cannot proceed further. I will have to assume that from henceforth he stands mute and declines to proceed. I am very reluctant to indicate that but I feel it is the only correct answer to the problem and to that end I will now entertain a motion. A motion for a new trial can never be made until the case has been disposed of by judgment. I will now entertain such application as counsel for the plaintiff may enter.''

Counsel for plaintiff then moved for a non-suit of defendant's cross complaint. This motion was granted. Thereupon plaintiff moved for a directed verdict on plaintiff's replevin action which was also granted. Judgment was entered declaring that the plaintiff was entitled to the return and possession of the gravel crushing and washing plant.

In an original proceeding entitled State ex rel. McConnell v. District Court, 120 Mont. 253, 182 Pac. (2d) 846, the defendant herein brought a mandamus proceeding attempting to set aside the above judgment. That case was brought here on an abbreviated record and this court said: ''Ordinarily, of course, a trial court may not terminate a trial by judgment before both parties have completely submitted their cases and rested. But we think an exception to this rule applies in cases where it ap-

pears from one party's evidence that no judgment in his favor would be proper. (Citing cases.) It may be, of course, that the trial court in this instance committed reversible error in granting the judgment and motion, *but in the absence of the evidence, and in view of the presumption of the correctness of judgments of trial courts, we may not now so conclude.* Had relator made a proper showing, either in the trial court or here, of additional evidence to be presented, and that it would have been such as to require submission of the case to the jury, our conclusion might be otherwise, as might that of the trial court.

"The situation presented is regrettable, both from the viewpoints of the litigants and the county which may be put to expense in addition to the substantial amount already incurred. While we feel the sensible and logical procedure would have been to continue the trial, we feel that our conclusion is indicated by the reasons above set forth. And we feel that the disposition we have decided upon is the more likely to insure substantial justice to all concerned." (Emphasis supplied.)

Failing in that proceeding, the defendant has appealed and it is upon a complete record that the cause is now before us.

The entire purchase price of the gravel crushing plant was to be the sum of $34,211, of which the defendant paid the sum of $6,911. The defendant executed and delivered to the plaintiff six promissory notes, which over the period of about 18 months took care of the balance of the indebtedness. The complaint alleged that none of the notes were paid, that some were past due, and that the defendant had defaulted in the payment of these notes. Therefore the whole of the contract was due and payable; that the plaintiff had declared the contract terminated, had demanded repossession of the goods, and that he was entitled to such repossession under the terms of that contract. The defendant's answer admits that the order was placed and that the described articles in the plaintiff's complaint were ordered, and that other specific articles and goods were also ordered, all of which are described in an exhibit, marked Exhibit A, attached to the answer. Other articles were also ordered

after Exhibit A and those goods are itemized in Exhibit B, also made a part of the answer. It is admitted that the goods were sold on a conditional sales contract and that the contract provided that the plaintiff might terminate the conditional sales contract and declare the whole contract due and payable. The execution and delivery of the notes is admitted. The answer denies that any default was made on the part of the defendant· and alleges that the plaintiff never performed the terms and conditions of the order as set forth in Exhibits A and B. Defendant admitted that the plaintiff demanded possession of the articles and goods mentioned in the complaint, and that demand was refused. The answer further alleges that prior to March 18, 1940, the defendant purchased certain deposits of sand and gravel in Valley county, Montana, and obtained the right to install and operate machinery and equipment to crush, wash, and produce sand and gravel on that property. On or about the 13th of March 1940, the United States invited bids for the furnishing and supplying of gravel and sand of specified kinds and character for use at a power plant building in connection with Fort Peck Dam. The defendant was desirous of bidding for this contract and obtained the land immediately described for that purpose and set about securing the necessary machinery to develop the sand and gravel deposit.

The plaintiff, Pioneer Engineering Works, through its western sales manager, solicited the defendant to purchase from the plaintiff the machinery for crushing, grading and washing the gravel aggregate, so that the defendant could enter into this contract with the government. The defendant furnished to the plaintiff the United States Government's invitation for bids and informed the plaintiff that he wished to purchase machinery and equipment adequate to produce the sand and gravel so that he might bid on the Government's proposal and if successful supply sand and gravel to comply with the contract. It is alleged that the plaintiff's western sales manager represented to the defendant that the kind of machinery and equipment necessary to produce sand and gravel complying with the specifications of

the invitation for bids was a gravel crushing, washing and grading machine manufactured by the plaintiff, and that plaintiff would sell the same to the defendant, would install it, would set the plant into operation, and when in operation it would produce 2,666 yards every 24 hours of aggregate sand and gravel properly washed and screened to meet the specifications required by the United States. The defendant, relying on this information, submitted a bid to the United States of America to furnish sand and gravel at certain specified prices per cubic yard. The entire stock pile of sand and gravel was to be delivered to the United States of America near the location of the power plant at Fort Peck Dam on or before the first day of November 1940. The plaintiff and plaintiff's agent knew that the sand and gravel had to be transported in trucks a distance of approximately 15 miles; that these deliveries had to be made at a time when weather conditions were favorable so that the gravel and sand could be loaded in the trucks before it was frozen; that the plaintiff knew that if the contract for the furnishing and delivering of the sand and gravel was to be carried out within the prescribed time the machinery and equipment had to be in operation before the 1st of July, 1940, in order that the deadline for deliveries could be met. The defendant submitted to the agent for the plaintiff detailed information showing the depth below the surface of the earth of the sand and gravel deposits, the conditions in place surrounding these deposits, and gave the plaintiff all the information that had been obtained by drilling test pits in and through the gravel and sand strata in the land in which the gravel pit was situated, so that the plaintiff would have complete information as to the nature and character of the plant and machinery, tools and equipment required to be used. On the 2nd of April 1940, the plaintiff knew the depth below the surface of the ground of the sand and gravel and the conditions surrounding it, and this information was used by the plaintiff to determine the kind, character and capacity of the machinery and equipment to be sold to the defendant, so that defendant could carry out his contract with the United States

Government. The contracting officer for the United States interviewed the plaintiff's agent so that the government would be informed of the kind of equipment and the nature of the installation that was to be used to perform the work upon which bids were to be submitted.

The defendant placed an order with the plaintiff corporation for the plant, tools, equipment and so forth. This order is Exhibit A attached to the answer and counterclaim. It is alleged that the order was never accepted by the plaintiff but after the order was made the plaintiff demanded that tests be made to determine the depth below the surface of the land the sand and gravel could be found, and to determine the conditions surrounding the sand and gravel deposit. These tests were made by the defendant at his expense under the direction of the western sales manager of the plaintiff corporation. They consisted of digging into the land, boring holes in the land, and testing the soils, both the overburden and the sand and gravel in the deposit. They were made during the months of April and May 1940. After the completion of the tests the agent informed the defendant he was satisfied with the tests and that the plaintiff corporation would immediately manufacture the necessary machinery, and deliver and assemble it so that the defendant could perform his contract with the government.

After the tests were made and as a result of the information obtained, the plaintiff demanded that the defendant order additional tools and equipment and the plaintiff complied with that demand by making the order which is Exhibit B in the defendant's answer and counterclaim. On June 3, 1940, the government of the United States entered into a contract with the defendant for the delivery of sand and gravel, which is Exhibit C attached to the counterclaim. On or about June 8, 1940, the defendant made the down payment in the sum of $6,911.

The warranty upon which defendant relies is set forth in Paragraph X of the cross complaint: ''The seller warrants the above plant will produce in 24 hours 2,666 yards of aggregate sand and gravel which will be properly washed and screened to

meet specifications required by United States Engineer Office, Fort Peck, Montana, under contract award to be entered into between said War Department and buyer herein. If said plant is properly operated and properly fed sand and gravel which does not contain any rock above 6 inches in size and no more than 25 % waste material assumedly between ¼ inch and ¾ inches in dimensions as shown by the C. G. Cooley and/or C. G. Cooley Company tests.''

In addition to the matter pleaded in Paragraph X of the cross complaint, Exhibit A also provided: ''The seller in no way warrants or guarantees the quality of the rock or sand or gravel nor the adequacy of the pit or place from which said rock, gravel and sand is obtained or taken or in, or on which said plant will operate,'' and ''Said goods are sold subject to the above stated warranties and no other, which warranties are in lieu of all other warranties or representations, express, implied, or statutory, and the Seller is to be wholly discharged of liability thereunder in case the Buyer fails to settle and pay for the goods herein ordered promptly and in accordance with the terms of this contract.''

The specifications mentioned in the above warranty are those contained in the contract between the government of the United States and the defendant as set out in Exhibit C.

The C. G. Cooley and/or C. G. Cooley Company tests were tests made by C. M. Hirst, a geological engineer whose report of his examination of the sand and gravel in the land owned by the defendant was made and dated at Glasgow, Montana, on June 16, 1934, and addressed to Mr. C. G. Cooley in the company office in the state of Missouri. A copy of Hirst's geological report was delivered to the plaintiff by the defendant on the 2nd day of April 1940 and therefore the information contained in the report was known to the plaintiff long before the execution of Exhibit A.

The defendant insists that a reasonable time for the manufacture and erection of the gravel crushing plant was not more than 90 days from the 15th day of April 1940, and that by the

15th day of July 1940, the plant should have been erected and in operation. However, it was not until the 22nd day of July 1940 that any of the units of the plant were delivered by the plaintiff to the nearest railroad station at Nashua, Montana, and it was not until the 1st day of August 1940 that the remainder of the units were delivered at the railroad station. These units were loaded upon four cars. They had to be trucked by the defendant from the station at Nashua, Montana, to the land near Glasgow, where the gravel deposit was located and where the plant and machinery was to be assembled and erected.

The defendant further alleges that on or about the 26th day of July 1940, the plaintiff corporation placed one of its engineers, W. J. Chapman, in charge of the plant to assemble and construct the plant unit in order that it would do the work for which it was designed. From the 26th of July to the 7th of September Chapman worked on the plant attempting to make it perform in accordance with the order and alleged warranty. On the 7th of September 1940 defendant alleges that both plaintiff and defendant agreed that there was no possibility of redesigning or reconstructing the plant so that it would perform the washing, crushing and grading operations necessary for the delivery of the gravel and sand to the government of the United States. The defendant then enumerates the following particulars in which the plant specifically failed to meet the alleged warranty:

1. The plant never had a capacity of more than 800 cubic yards per day as against the warranted capacity of 2,666 cubic yards.

2. That the screens furnished by the plaintiff at the plant were so small in area that it could have never cleaned the required quantity.

3. That the plant never graded and properly washed fine sand run through the plant but that the fine sand escaped. Therefore the defendant was unable to supply sand to the United States in accordance with his contract.

4. That the conveyor furnished with the plant was 50 feet

too short to carry the products from the pit and therefore extra hauling operation was entailed and that the washing unit was too small by at least 50 cubic yards per hour. The washing unit had a capacity of 21 cubic yards per hour and a capacity of between 70 to 90 cubic yards was necessary to wash the sand and gravel.

5. That the washing apparatus was improperly installed in the plant so that the conveyor which carried all of the earth, gravel, sand and so forth to the plant did not pass through the washing apparatus in the proper manner and the plant therefore did not provide the gravel and sand of the quality to meet the government specifications.

Other allegations in defendant's cross complaint, which contains 33 separately numbered paragraphs, relate to items of damage sustained by the defendant as a result of the alleged failure of the plaintiff corporation to provide equipment and machinery to do the work as warranted.

In the plaintiff's reply to the defendant's answer and cross complaint it was admitted that a sales contract in the form of Exhibit A was executed by the defendant and the plaintiff.

It is further admitted in plaintiff's reply that the contract was modified on or about June 8th by a writing in the form of Exhibit B as set forth in the defendant's answer.

It is the contention of the plaintiff, Paragraph XI, that while its agent, Mr. Hanratty, had explained to the contracting officer of the United States the character of the machinery and the capacity of the machinery ordered by defendant's Exhibit A, the order was qualified by the condition that the effective operation of said goods depended upon the character of the gravel deposits and the method of operation and that the plaintiff would not in any way guarantee the deposit of gravel from which the defendant proposed to obtain his material.

The plaintiff contends that the only theory upon which the defendant is entitled to recover is that contained in Paragraph XII of the cross complaint. This portion of the cross complaint sets forth the execution of the contract, Exhibit A, and

then alleges that the original contract was modified and superseded by an additional agreement entered into between the parties thereafter. The plaintiff asserts that the defendant is prevented from proving the warranty in Exhibit A for reasons later discussed, and that therefore that contract must have been superseded or defendant's cross complaint fails for lack of proof. On this phase of the case there was written evidence that might tend to show a modification of the contract. The pleadings show that the contract was modified on June 4, 1940, by providing that additional machinery be shipped to the defendant. This is the modification set forth in Exhibit B. Other modifications are contained in other letters. These include a letter from the Pioneer Engineering Works to McConnell changing the method of payment and making an extension of time for payment. Whether these letters prove that the contract was materially altered or not is a jury question, but they were written evidence of an alteration and should have been admitted.

There are at least two other theories set forth in the cross complaint, the first of which is the theory that there was non-delivery of the machine that the defendant ordered. Throughout the pleadings and throughout the course of the trial the defendant insisted that there was never any delivery of this plant. It was admitted that approximately four carloads of machinery were shipped by the plaintiff to the defendant and delivered to him at the railroad station at Nashua, but when this conglomerate of machinery was assembled and put together it was not the plant that the defendant ordered; it never performed as the plant that defendant ordered was supposed to have performed; that therefore, while there was a delivery of certain parts of a plant, there was no delivery of the specific washing and crushing plant ordered. Secondly, the defendant contends there was a breach of warranty in that the plant that was delivered did not conform to the warranty contained in the contract. The pleadings are the same as they were when this cause was sent back for retrial in accordance with the decisions of this court in 113 Mont. 392, 130 Pac. (2d) 685, 132 Pac. (2d) 160.

At that time when this court held that the cross complaint stated a cause of action for relief for the defendant, the plaintiff could have moved the court to require the defendant to separately state and number his causes of action. This the plaintiff did not do. Therefore, any objection to the intermingling of separate causes of action is waived. Sec. 9130, R. C. M. 1935; Fleming v. Consolidated Motor Sales Co., 74 Mont. 245, 240 Pac. 376. At the beginning of the trial the plaintiff could have moved the court to require the defendant to elect upon which theory he was proceeding if such theories were incompatible. Lowery v. Carrier, 55 Mont. 392, 177 Pac. 756. Plaintiff did not so move the court. Therefore, at this stage of the proceedings the defendant is entitle to recover upon any of the three theories alleged in his cross complaint and to submit proof upon any of those theories.

In the previous appeal, Pioneer Engineering Works v. McConnell, 113 Mont. 392, 130 Pac. (2d) 685, 132 Pac. (2d) 160, 161, the court merely said: "We have given consideration to the point and are satisfied that the cross-complaint states facts sufficient to entitle defendant to at least some relief against plaintiff and, that being so, evidence thereunder should be received."

In view of the brief statement of the court, it is difficult to determine whether the court meant that the defendant had stated a cause of action for relief on one of the theories or a cause of action for relief on all of the theories set forth in the cross complaint. However, testing the cross complaint by the ordinary rules by which we test a pleading, in each instance the defendant has set forth first, a contract; second, an alleged breach; and third, resulting damages. Under the rules of this court those three items and the additional item of performance by the complainant insofar as it is incumbent upon him to perform prior to the breach must be alleged. Chealey v. Purdy, 54 Mont. 489, 171 Pac. 926. Complete performance was not alleged under defendant's second theory nor has it been completely proven. That will be treated in more detail later.

Defendant's theory on delivery may be summarized: The plaintiff was obliged to deliver a specific gravel crushing and

washing plant; this obligation was a condition precedent to the obligation of the defendant to accept and pay for the same; such gravel crushing and washing plant was never delivered by the plaintiff and therefore the delivery of different machinery was a breach of a condition precedent for which defendant was entitled to recover damages under the general law relating to contracts; the limitation of warranty and disclaimer of any other warranties above quoted from the sales contract applied only to the identical article agreed to be furnished by the plaintiff to the defendant and had no force or effect when an entirely different plant was delivered to the defendant.

In the law of sales, conditions have been distinguished from warranties. The most cited authority is the opinion of Lord Abinger as quoted by Benjamin on Sales, 7th Ed., sec. 600: ''A good deal of confusion has arisen on many of the cases upon this subject from the unfortunate use made of the word 'warranty.' Two things have been confounded together. A warranty is an express or implied statement of something which a party undertakes shall be part of a contract and though part of the contract collateral to the express object of it. But in many of the cases the circumstance of a party selling a particular thing by its proper description has been called a warranty and the breach of such a contract a breach of a warranty; but it would be better to distinguish such cases as a noncompliance with the contract which a party has engaged to fulfill: as, if a man offers to buy peas of another and he sends him beans, he does not perform his contract, but that is not a warranty; there is no warranty that he should sell him peas, the contract is to sell peas, and if he sell him anything else in their stead, it is a nonperformance of it.''

While this distinction is no longer the rule in those states which have adopted the Uniform Sales Act, it is still in effect in other states which, like Montana, have not adopted the sales Act.

In Hurley Gasoline Co. v. Johnson Oil Refining Co., 118 Okl. 26, 246 Pac. 438, the contract was to deliver to the plaintiff five cars of white gasoline. Two cars were delivered and then three

cars of off-color or yellow gasoline were delivered. The court found evidence that the gasoline in three tank cars was not of the grade provided for in the contract and that this constituted a non-delivery. The court said this is no error of law. "The defendant guaranteed the gasoline at point of destination to be 'water white' and it was 'yellow,' and no obligation rested upon plaintiff to accept the same. If one orders white paint and the seller delivers yellow paint, it is true that the yellow paint may cover as much surface of the house or barn, but it is not what the buyer ordered and delivery wholly failed * * *"

In Pope v. Allis, 115 U. S. 363, 6 S. Ct. 69, 72, 29 L. Ed. 393, there was a contract for delivery of three hundred tons of Scotch pig iron, five hundred tons of American iron. The American iron was not of the grade called for by the contract. The court said: "When the subject-matter of a sale is not in existence, or not ascertained at the time of the contract, an undertaking that it shall, when existing or ascertained, possess certain qualities, is not a mere warranty, but a condition, the performance of which is precedent to any obligation upon the vendee under the contract; because the existence of those qualities being part of the description of the thing sold becomes essential to its identity, and the vendee cannot be obliged to receive and pay for a thing different from that for which he contracted."

In United Iron Works v. Henryetta Coal and Mining Co., 62 Okl. 99, 162 Pac. 209, 210, the defendant ordered from the plaintiff a weigh pan and an automatic scale. Later the defendant cancelled the order, giving as his reason that there was not room in the mine to install a weigh pan of the dimensions manufactured by the plaintiff. Thereafter, after a conversation with an agent for the plaintiff, who had in his possession blueprints of the weigh pan manufactured by his principal, the order was reinstated and delivery was made, and the shipment was rejected. The court quoted from Lord Abinger and Benjamin on Sales above and then said that certain evidence which tended to show that the weigh pan was not the same as the weigh pan ordered was admissible even though an express warranty had

not been pleaded. The court said: "The sole question upon this branch of the case was: Did the plaintiff deliver the pan which the defendant ordered?"

The court continued with a comment from Benjamin on Sales, section 600: "If the sale is of a described article, the tender of an article answering the description is a condition precedent to the purchaser's liability, and if this condition be not performed the purchaser is entitled to reject the article, or if he has paid for it, to recover the price as money had and received for his use; whereas in case of warranty the rules are very different."

Columbian Iron Works & Dry Dock Co. v. Douglas, 84 Md. 44, 34 A. 1118, 33 L. R. A. 103, 57 Am. St. Rep. 362, was an action for damages for a breach of contract. The plaintiff purchased from the defendant all of the steel scrap in the shipyard "consisting of clippings and punchings from the steel plates and angles and beams used in the construction of the United States cruisers." After delivery and payment for the goods the plaintiff discovered that other steel scrap was intermingled, thus reducing its value. It was there held that the written specific description was not a warranty but a condition precedent and that the goods sold had to be what they were described to be and that a failure to deliver the goods as described was a breach of the contract for which the plaintiff could recover.

Other cases to the same effect are Wolcott v. Mount, 36 N. J. L. 262, 13 Am. Rep. 438; Id., 38 N. J. L. 496, 20 Am. Rep. 425, and Jones v. George, 56 Tex. 149, 42 Am. Rep. 689; Fogle v. Brubaker, 122 Pa. 7, 15 A. 692; and Fogg's Adm'r v. Rogers, 84 Ky. 558, 2 S. W. 248. See also: Williams v. Dixie Chevrolet Co., 209 N. C. 29, 182 S. E. 719; and Poole v. Pinehurst, Inc., 215 N. C. 667, 2 S. E. (2d) 871, where the court held that if the goods sold were so defective that they did not reasonably fit the use for which they were intended then there was a failure of consideration and a breach of the contract.

In the instant case there was evidence that the machinery was delivered between the 22nd of July and the 30th of July 1940 and the first test run was made on August 7, 1940. The

plant ran about three hours on the first day after the initial construction was completed. It worked so poorly that it was closed down and it was run intermittently thereafter between the 7th of August and the 7th of September. There is evidence that it never worked properly in separating and grading sand; that during the month that defendant attempted to operate the plant only 800 to 900 tons of acceptable sand was produced; that the screws in the hydrator did not function properly; that the sand that was delivered was too wet; that the conveyor belt became saturated with water, causing stoppages; that the motor supplied by the Pioneer Engineering Works was not powerful enough; that the scalpers did not work properly; that the motor that was supplied by the Pioneer Company to run the scalpers was defective; that when the conveyor belt was loaded to capacity the load would slip and pile up at the bottom of the belt; that the bucket conveyors caught on the vibrator screens; that the screens did not work and new screens at one time were sent from the home office of the plant.

There is evidence that at one time three, sometimes two, and during the entire period from August 7th to September 7th, one man in the employ of the plaintiff company, was in charge of the assembling and construction of the plant, and they were never able to get it in satisfactory operation. Of course all of this was denied by the plaintiff seller and evidence refuting these contentions was introduced. Had the case been continued, other evidence might have been introduced by the plaintiff seller in rebuttal. This summary only indicates that there was evidence on behalf of defendant to support the contention set forth in his cross complaint that there had never been a delivery and to raise a fact question that should have been submitted to the jury for its determination.

Defendant's second theory is that the plaintiff breached the warranty set forth in Paragraph X of the cross complaint. Defense to this contention is that the defendant could not rely upon the warranty for two reasons: First, under the express terms of the conditional sales contract the defendant was prevented from

relying upon the warranty because he himself had failed to perform his part of the contract in that he did not make the payments that were provided therein. The contract said: "Said goods are sold subject to the above stated warranties and no other, which warranties are in lieu of all other warranties or representations expressed, implied or statutory and the seller is to be wholly discharged of liability thereunder in case the buyer fails to settle and pay for the goods herein ordered promptly and in accordance with this contract."

The plaintiff made a down payment of $6,911. In addition to the down payment there were to be six deferred payments each in the sum of $4,550. Six notes were made out, all dated the 15th day of April 1940 and to become due August 1, 1940, September 1, 1940, October 1, 1940, July 1, 1941, August 1, 1941, and September 1, 1941. The note that was to become due September 1, 1941, was cancelled and in its place substituted a note coming due August 25, 1940. The entire evidence shows that it was contemplated that the buyer was to pay for the plant upon receipt of his payments from the government as he delivered the material in accordance with his contract. Originally in the conditional sales agreement there was the following provision: "Seller agrees to furnish the equipment described herein upon receipt of certified notice from the U. S. Engineer's office, Fort Peck, Montana, that the pit does contain in proper proportions, sand and coarse aggregate material that is acceptable chemically and physically to the War Department and does fully comply with the specifications set forth in Invitation No. 631-40-142."

This portion of the conditional sales contract was deleted in response to a telegram dated May 2, 1940, from the Pioneer Engineering Works. Also in evidence is a telegram dated the 29th of April 1940 to McConnell from the Pioneer Engineering Works: "Mailing you accepted sales contract tonight contingent upon government acceptance of pit material." These two provisions indicate that the Pioneer Engineering Works relied on having the contract with the government accepted and in op-

eration before they extended the credit to Mr. McConnell. McConnell was notified of the acceptance of his bid by the government by letter dated May 14, 1940. On the 4th of June 1940 the War Department notified McConnell to proceed with his contract. This notice required him to proceed within 60 days after its receipt. The Pioneer Engineering Works was immediately notified of the acceptance of the bid and informed that McConnell had received a letter instructing him to proceed. McConnell was required to begin delivering sand and gravel by the 3rd of August 1940, yet the various parts of the plant did not begin to arrive until the 22nd of July. The last portions of the machinery arrived on July 30, 1940. The first test run of the plant was not made until the 7th of August 1940. McConnell was required to obtain additional time from the government in which to make his first deliveries. Note also that while it was contemplated that some of the payments be made out of the compensation McConnell received in carrying out his contract, the delivery of the plant was not made so that he could supply any sand or any gravel on August 1, 1940, or on August 25, 1940. On September 1, 1940, when the third note became due the plant was still not in working operation. On July 5, 1940, the Pioneer Engineering Works, by its vice president, wrote to Mr. McConnell about the method of payment and this letter confirmed a conversation of July 3rd. At that time the note of $4,550 due August 25, 1940, was substituted for the note due September 1, 1941. The letter contains the following quotation: ''As explained to you over the phone, we will extend your note a few days if you find it is impossible to secure funds from your second estimate in time to take care of the note on the due date. We also will be prepared to extend the September note so as to keep the payments spaced in such a manner so as to enable you to take care of them out of the payments you receive at ten day intervals from the government.''

Again, on August 1, 1940, the Pioneer Engineering Works wrote to Mr. McConnell that his first note was due. The letter continues: ''We realize that your equipment is just now being

set up on your job and we hope that today or tomorrow you will commence making delivery to stock piles. Inasmuch as we agreed in our letter of July 5th to extend a few days your notes maturing on August 25th and September 1st if necessary we trust that you can therefore arrange to pay your August 1st maturity within a few days.''

Mr. McConnell replied to that letter by a letter dated August 10th wherein he pointed out that the trial run on August 7th was unsatisfactory and that it was apparent that certain changes would have to be made in the machinery. He wrote that if he could get started producing material on the 12th with an estimate of a sufficient amount from the 12th to the 20th he could begin making his payments. In response to that letter, on the 13th of August the Pioneer Engineering Works wrote to Mr. McConnell: ''We hope that you were able to start producing material yesterday, Monday [August 12th] so that you will have produced sufficient material by the 20th of this month for a fair sized estimate which we understand will be paid on or before the 30th of the month.''

On August 14th McConnel was notified by the War Department that insufficient material had been delivered and he was also notified that the trial runs of his equipment had failed to produce satisfactory sand or gravel. Both sand and gravel were unsatisfactory in gradation and in clay contamination. He was further instructed to advise the government as to how he proposed to overcome these difficulties and of his plan for the production of satisfactory material.

On the 6th of September 1940, the War Department notified Mr. McConnell that because of his failure to deliver sand and gravel in accordance with the previous schedule a certain portion of his contract was terminated and the government would procure such sand and gravel elsewhere and he would be responsible for the loss incurred. Further schedules were set out in additional letters and the contract was completely terminated by the government on the 25th of September 1940.

Under these facts, notwithstanding the provision in the con-

tract that the seller was to be wholly discharged of liability under the warranty in case the buyer failed to pay for the goods ordered, if this failure was caused by the action of the plaintiff, then nonperformance was excused. Section 7452, R. C. M. 1935, provides: ''The want of performance of an obligation, or of an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate:

''I. When such performance or offer is prevented or delayed by the act of the creditor, or by the operation of law, even though there may have been a stipulation that this shall not be an excuse; * * *''

So that when the defendant sought to introduce parol evidence to show the surrounding circumstances, it was admissible upon the theory that it showed that plaintiff was at fault in preventing the performance of the contract because at all times it was contemplated between the parties that payment for the balance of the purchase price over and above the down payment would be made out of the advancements made by the government for sand and gravel delivered in accordance with the contract between McConnell and the government.

Since the alleged failure of the plant furnished to the defend- ant prevented him from ever making any deliveries so that the defendant never received any payment for sand and gravel delivered to the government, he was thereby prevented from paying the notes and keeping the condition set forth above, but by the specific wording of the statute a stipulation to that effect shall not be an excuse when the other party prevents such performance. Therefore the first contention that the defendant could not rely upon the warranty because he had failed to make the payments provided in the conditional sales contract is without merit under the provisions of section 7452, supra. See 1 Williston on Sales, Rev. Ed., sections 193 and 193a.

The second reason advanced by the plaintiff preventing the defendant from relying upon the warranty is that this was a conditional sales contract with title to remain in the plaintiff.

Therefore since title remained in the plaintiff defendant had never acquired title and had no action for a breach of warranty. As pointed out by counsel for the plaintiff, the rule at common law was as he contends, that title had to be in the complainant before he could rely upon a breach of warranty. In the states that have adopted the Uniform Sales Act and the Uniform Conditional Sales Act there is no longer any doubt but that a conditional buyer may recover for a breach of warranty. In principle this is in accord with analogous situations in other fields of the law. A conditional buyer takes possession and uses the machinery at once and if it does not do what it is warranted to do he suffers an immediate injury. In the instant case, assuming that there was a breach of warranty, the injury immediately arose and the damage was done to this defendant at the time that the gravel washing plant failed to produce gravel in accordance with the terms of the contract.

For this damage the defendant was entitled to recover as soon as the detriment occurred.

One clear cut principle established in the first hearing on this case is that when the seller seeks to recover the property sold the buyer is entitled to more than a counterclaim to defeat the action. He is entitled to additional damages if the injury justifies it. See Williston on Sales, sec. 608, p. 342, where Pioneer Engineering Works v. McConnell, 113 Mont. 392, 130 Pac. (2d) 685, 132 Pac. (2d) 160, is among the cases cited as authority for this proposition. If the buyer is entitled to establish a counterclaim for injury done by virtue of a breach of warranty he is entitled to assert this right when it first arises and whether he has title in himself or has possession under a contract by which title remains in the seller is immaterial. Despite the conflict of authority the better rule is that the conditional buyer's remedy for breach of warranty does not have to wait until title has passed. See annotations in 48 A. L. R. 969, 973 and 130 A. L. R. 753, 756, and McCargar v. Wiley, 112 Or. 215, 229 Pac. 665; Bintz Co. v. Mueggler, 65 Idaho 760, 154 Pac. (2d) 513.

The defendant then had a right to rely upon the warranty set

out in Exhibit A. He had a right to introduce evidence to prove that there had been a breach of that warranty and to show the extent to which he had been damaged. If that evidence was conflicting he had a right to have that conflict determined by the jury. In showing that the plaintiff was responsible for his default in payments, evidence should have been admitted to let the jury ascertain whether the failure to make the payments was excused by the action of the plaintiff.

The case did not reach its conclusion. The defendant's case in chief on his cross complaint had not been concluded when his attorneys became physically unable to continue. Undoubtedly a good deal of the evidence introduced by the defendant would have been rebutted by the plaintiff. But the defendant had pleaded a cause of action, had introduced some evidence in support of it and should have been permitted to introduce other evidence on the question of delivery and breach of warranty that was excluded. As a result, questions of fact were raised that could only be resolved by a jury.

The defendant's motion for continuance should have been granted when his attorneys were physically unable to continue with the case. On considering this phase of the question when the cause was before us in 1947 (Cause No. 8751, State ex rel. McConnell v. District Court, 182 Pac. (2d) 846), 850, on petition for writ of mandate, this court held that on the abbreviated record then before the court it could not be definitely determined whether the trial court had abused his discretion in refusing to grant the continuance. With the complete record before us it is apparent that there were fact questions to submit to the jury under the pleadings and evidence. The defendant still had evidence to introduce and it was error for the court to terminate the case and refuse to grant the postponement requested. In Cause No. 8751, supra, we said, "the sensible and logical procedure would have been to continue the trial * * *" After our examination of the record we must conclude that it was error not to grant the continuance requested and postpone

further hearings until counsel had recovered or other counsel retained.

The judgment is reversed and the cause remanded to the district court for a new trial.

Mr. Chief Justice Adair and Associate Justices Angstman, Freebourn and Bottomly, concur.

Rehearing denied January 5, 1950.